United States District Court
Eastern District of New York

-------------------------------------------------------------------------X

AFS/IBEX, a division of METABANK,

*Plaintiff,*

v.

AEGIS MANAGING AGENCY LIMITED, as Managing Agent of
SYNDICATE 1225 AT LLOYD'S, CRC INSURANCE
SERVICES, INC., and TRANSPORTATION WRITERS, INC.,

*Defendants.*

-------------------------------------------------------------------------X

THIRD AMENDED COM-
PLAINT
18 Civ. 631
L.D.W.
A.K.T.
Plaintiff demands trial by jury

Plaintiff, by its attorney, STEVEN G. LEGUM, as and for its complaint, respectfully alleges:

1. Plaintiff AFS/IBEX ("AFS") is a division of MetaBank, a national bank existing by virtue of and under the laws of the United States with its place of business in the State of Texas. AFS does business in the State of New York as an insurance premium finance company.

2. Upon information and belief, Aegis Managing Agency Limited is a corporation existing by virtue of and under the laws of Great Britain which is the managing agent of Syndicate 1225, which does business on the Lloyd's of London Exchange ("Aegis"). Aegis underwrites insurance risks in the United States and is authorized and admitted to do so under the laws of the State of New York.

3. Upon information and belief, CRC Insurance Services, Inc. ("CRC") is a corporation existing by virtue and under the laws of the State of Alabama.

4. Upon information and belief, CRC is licensed in the State of New York as an insurance brokerage firm and does business as such within the State of New York.

5. Upon information and belief, Transportation Writers, Inc. ("Transportation") is a corporation existing by virtue of and under the laws of the State of New York and is licensed by the Department of Financial Services of New York as an insurance brokerage firm.

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that there is complete diversity and the amount in controversy is in excess of $75,000.00, exclusive of interests and costs.

7. Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391 in that one of the defendants, Transportation, is a citizen of New York with its place of business within the Eastern District of New York and that the insurance policy upon which this action is based covered a risk for a New York insured located within the Eastern District of New York.

8. Upon information and belief, Aegis underwrote two policies of insurance for Red Hook Construction Group–II, LLC ("Red Hook").

9. Upon information and belief, one policy was an umbrella policy and the other a general liability policy, both of which incepted on October 3, 2016.

10. Upon information and belief, the total premiums for the two policies was $3,320,960.00.

11. Plaintiff financed the aforesaid premiums at Red Hook's request and advanced the sum of $2,988,864.00 to Aegis, through its representatives, as directed.

12. Such financing was made pursuant to a premium finance agreement executed by Red Hook and forwarded to plaintiff by Red Hook's insurance broker, Transportation. The premium finance agreement is annexed hereto as exhibit "A."

13. Pursuant to the terms of such premium finance agreements between Red Hook and the plaintiff, the funds financed were to be repaid to the plaintiff, together with interest.

14. In the premium finance agreement, the insured, Red Hook, assigned its rights to unearned and return premiums to plaintiff.

15. The defendants were duly, properly, and lawfully notified of the assignment of unearned and return premiums to the plaintiff.

16. Upon information and belief, Aegis underwrote an additional policy of insurance for Red Hook. Upon information and belief, such policy was an umbrella policy which incepted on March 26, 2017.

17. Upon information and belief, Aegis, at or about the time that it underwrote the aforesaid um-

brella policy extended the term of the general liability policy which it had previously underwritten.

18. Upon information and belief, the total premiums for such umbrella policy and for the extension of the general liability policy was $2,905,760.00.

19. Plaintiff financed the aforesaid premiums at Red Hook's request and advanced the sum of $1,783,788.16 to Aegis, through its representatives, as directed.

20. Such financing was made pursuant to a premium finance agreement executed by Red Hook and forwarded to plaintiff by Red Hook's insurance broker, Transportation. The premium finance agreement is annexed hereto as exhibit "B."

21. In the premium finance agreement, Transportation represented that the "policies can be canceled by Insured or the company and the unearned premiums will be computed on the standard short rate or pro rata basis." Such representation, among others, was made and signed by an authorized agent of Transportation.

22. Upon information and belief, Transportation placed the aforesaid insurance through CRC who, in turn, procured the policies of insurance from an authorized agent of Aegis.

23. Pursuant to the terms of the premium finance agreement (exhibit "B") between Red Hook and the plaintiff, the funds financed were to be repaid to the plaintiff, together with interest.

24. In the premium finance agreement, the insured, Red Hook, assigned its rights to unearned and return premiums to plaintiff.

25. The defendants were duly, properly, and lawfully notified of the assignment of unearned and return premiums to the plaintiff.

26. The insured, Red Hook defaulted, in whole or in part, on such payments.

27. Upon the default of the insured, plaintiff, pursuant to the premium finance agreements and the controlling statutes, directed the cancellation of the underlying policies of insurance issued by Aegis.

-3-

28. Upon information and belief, the aforesaid polices of insurance were canceled by Aegis.

**FIRST COUNT AGAINST AEGIS MANAGING AGENCY LIMITED, as Managing Agent of SYNDICATE 1225 AT LLOYD'S**

29. At the time the above policies were or should have been canceled, upon information and belief, at least $1,603,342.02 was due as and for return and/or unearned premiums from defendant Aegis.

30. Aegis has failed and refused to forward such sums to the plaintiff, although duly demanded.

31. By virtue of the foregoing, the Aegis owes plaintiff the sum of $1,603,342.02.

**SECOND COUNT AGAINST CRC INSURANCE SERVICES, INC.**

32. Prior to accepting the premium finance agreements forwarded to plaintiff and prior to advancing the premiums, on October 14, 2016 and March 28, 2017, plaintiff placed a call to CRC to confirm the existence of the policies and certain terms thereof. A representative of CRC advised plaintiff on both occasions that none of the policies had fully earned premium provisions.

33. Plaintiff justifiably relied upon such representations.

34. CRC knew that plaintiff would rely upon such representations since insurance premium finance loans are collateralized loans and the premium finance lender relies upon the existence of collateral, to wit: unearned premiums in the making of the loan, but for which neither plaintiff or any premium finance lender would make such loan.

35. Aegis has advised plaintiff that there are provisions in the policies of insurance by virtue of which the premiums were either auditable and/or loss sensitive, as a result of which unearned premiums would not be computed on either a standard short rate or pro rata formula.

36. Aegis maintains that the premiums were fully earned, notwithstanding the fact that the insurance policies were canceled prior to their stated terms.

37. CRC knew the terms of the coverage, including the terms and conditions of the premiums and how they are earned, having placed it with Aegis.

-4-

38. By virtue of the foregoing the representations made by CRC to plaintiff, upon which plaintiff justifiably relied were false and incorrect and known by CRC at the time made to be false and incorrect.

39. Upon information and belief, CRC knew that Red Hook required a loan in order to pay the premiums for the insurance which CRC placed for it.

40. Upon information and belief, CRC obtained a commission for the placing of the aforesaid insurance.

41. But for the representations made by CRC to plaintiff, plaintiff would not have made the premium finance loans to Red Hook and CRC would not have received a commission.

42. By virtue of the foregoing, plaintiff has been damaged in the sum of $1,603,342.02.

43. There is now due and owning to the plaintiff from defendant CRC the sum of $1,603,342.02.

### THIRD COUNT AGAINST TRANSPORTATION WRITERS, INC.

44. In the premium finance agreements, Transportation represented that the "policies can be canceled by Insured or the company and the unearned premiums will be computed on the standard short rate or rata basis." Such representation, among others, was made and signed by an authorized agent of Transportation.

45. Upon information and belief, Transportation placed the aforesaid insurance through CRC who, in turn, procured the policies of insurance from an authorized agent of Aegis.

46. Plaintiff justifiably relied upon such representations.

47. Transportation knew that plaintiff would rely upon such representations since insurance premium finance loans are collateralized loans and the premium finance lender relies upon the existence of collateral, to wit: unearned premiums in the making of the loan, but for which neither plaintiff or any premium finance lender would make such loan.

48. Aegis has advised plaintiff that there are provisions in the policies of insurance by virtue of

-5-

which the premiums were either auditable and/or loss sensitive, as a result of which unearned premiums would not be computed on either a standard short rate or pro rata formula.

49. Aegis maintains that the premiums were fully earned, notwithstanding the fact that the insurance policies were canceled prior to their statement terms.

50. Transportation knew the terms of the coverage, including the terms and conditions of the premiums and how they are earned, having placed it with Aegis.

51. By virtue of the foregoing the representations made by Transportation to plaintiff, upon which plaintiff justifiably relied were false and incorrect and known by Transportation at the time made to be false and incorrect.

52. Upon information and belief, Transportation knew that Red Hook required a loan in order to pay the premiums for the insurance which it placed for it.

53. Upon information and belief, Transportation obtained a commission for the placing of the aforesaid insurance.

54. But for the representations made by Transportation to plaintiff, plaintiff would not have made the premium finance loans to Red Hook and Transportation would not have received a commission.

55. By virtue of the foregoing, plaintiff has been damaged in the sum of $1,603,342.02.

56. There is now due and owning to the plaintiff from defendant Transportation the sum of $1,603,342.02.

WHEREFORE, plaintiff respectfully prays for judgment on the first count against Aegis Managing Agency Limited as managing agent of Syndicate 1225 at Lloyd's in the sum of $1,603,342.02, on the second count against CRC Insurance Services, Inc. in the sum of $1,603,342.02, and on the third count against Transportation Writers, Inc. in the sum of $1,603,342.02, together with interest, costs, and disbursements.

Dated:  Mineola, New York
        February 20, 2019

STEVEN G. LEGUM
*Attorney for Plaintiff*
170 Old Country Road
Mineola, New York 11501
(516) 873-9300

by:_____
Steven G. Legum

To:  HURWITZ & FINE, P.C.
     1300 Liberty Building
     Buffalo, New York 14202

     LEWIS BRISBOIS BISGAARD & SMITH LLP
     77 Water Street
     New York, New York 10005

-7-

# EXHIBIT A

# AFS◉IBEX
### A division of MetaBank®

**PREMIUM FINANCE AGREEMENT**

☑ COMMERCIAL
☐ ADDITIONAL PREMIUM

Acct # 1096844

| AFS/IBEX A division of<br>MetaBank®<br><br>PO Box 224528<br>Dallas, TX 75222-4528<br>Tel: (800) 299-5626<br>Fax (214) 954-0537 | AGENT'S NAME AND ADDRESS     CODE:   A16330<br>Transportation Writers Inc<br>20 Broadhollow Rd<br>Ste 1001A<br>Melville, NY 11747<br>(631) 425-5111 | BORROWER'S NAME AND ADDRESS<br>RED HOOK CONSTRUCTION GROUP-II, LLC<br>83 E Main St<br>Bay Shore, NY 11706<br>(631) 841-4501 |
|---|---|---|

| A. Total Premiums | B. Down Payment | Unpaid Principal Balance | C. Document Stamp Tax | D. Amount Financed (A - B + C) | E. Finance Charge | F. TOTAL OF PAYMENTS (D + E) | ANNUAL PERCENTAGE RATE |
|---|---|---|---|---|---|---|---|
| $ 2,905,760.00 | $ 1,121,971.84 | $ 1,783,788.16 | $ 0.00 | $ 1,783,788.16 | $ 135,705.81 | $ 1,919,493.97 | 5.990 % |

| Payment Schedule | NUMBER OF PAYMENTS | AMOUNT OF EACH PAYMENT | FIRST PAYMENT DUE |
|---|---|---|---|
| | 17 | $              112,911.41 | 4/26/2017 (Monthly) |

Quote Number:1708544
Date Generated: 3/23/2017 11:59:40 AM

### SCHEDULE OF POLICIES

| POLICY PREFIX AND NUMBER | EFFECTIVE DATE OF POLICY | NAME OF THE INSURANCE COMPANY AND NAME/ADDRESS OF GENERAL OR POLICY ISSUING AGENT | TYPE OF COVERAGE | POLICY TERM | PREMIUM |
|---|---|---|---|---|---|
| TBI | 3/26/2017 | C05238-*Lloyds Of London<br>G05574-CRC Insurance Svs-NY Jericho<br>[ME:25.000 %, CX:10]        [PR] | UMB | 19 | 800,000.00 |
| | | | Emd. Taxes/Fees | | 0.00 |
| | | | Fin. Taxes/Fees | | 30,160.00 |
| TBI | 10/3/2016 | C05238-*Lloyds Of London<br>G05574-CRC Insurance Svs-NY Jericho<br>[ME:25.000 %, CX:10]        [AU, PR] | GL | 24 | 2,000,000.00 |
| | | | Emd. Taxes/Fees | | 0.00 |
| | | | Fin. Taxes/Fees | | 75,600.00 |
| 100% OF ALL FEES AND TAXES MUST BE INCLUDED | | TOTAL PREMIUMS must agree with Block "A" above | | TOTAL | $ 2,905,760.00 |

509,623.87,1,274,164.29

## Security Agreement

1. **DEFINITIONS:** The above insured ("Borrower" or "Insured") is the debtor. AFS/IBEX A division of MetaBank®, is the lender to whom the debt is owed (LENDER). Singular words shall mean plural and vice versa as may be required in order to give the agreement meaning "insurance company or company", "insurance policy or policy", and "premium" refer to those items listed under 'Schedule of Policies'.

2. **PROMISE TO PAY:** Borrower promises to pay LENDER the total amount in Block "F" above unpaid in full. This total equals the amount financed together with interest at the rate identified above computed in accordance with the Rule of 78's. The monthly payment amount reflected above will be due on the same day each month. Payments include principal and interest. Insured will pay LENDER at its address above, or such other place LENDER may designate in writing.

3. **SECURITY INTEREST:** Borrower hereby grants LENDER a security interest in all insurance policies listed herein and all unearned premium, returned premium, dividend payments, and loss payments which reduce the unearned premiums thereof ("Collateral"). Borrower assigns to LENDER as security for the total amount payable in this Agreement any of the above which may become payable under the insurance policies, subject to any mortgages or loss payee interests. Borrower agrees to take whatever actions are requested by LENDER to perfect and continue LENDER's security interest in the Collateral.

4. **LATE CHARGE:** For any installment payment received more than five (5) days (or such greater number of days required by applicable law) after the due date, Borrower agrees to pay a late charge of up to 5% of such installment.

The undersigned warrants and agrees:
NOTICE TO INSURED: (1) DO NOT SIGN this agreement until you have read all pages and filled in any blank spaces. (2) When signed below by you, or on your behalf, you (Borrower) acknowledge receipt of a copy of this Agreement, attest to having full power and authority to enter into this Agreement and sign on behalf of all entities named above as Borrowers, and that you understand and agree to the provisions printed above and in the ADDITIONAL PROVISIONS section of this Agreement and that both the front and any subsequent pages constitute the Agreement between Borrower and Lender. (3) You understand that this is for commercial policies and the producer may be receiving compensation from the LENDER for the preparation and administration of this Agreement as further described below.

Borrower hereby requests LENDER to pay the financed portion of its insurance policy premiums listed above, on its behalf and AGREES TO THE PROVISIONS OF THIS AGREEMENT, INCLUDING THE PROVISIONS ABOVE AND THOSE THAT FOLLOW.

Date    3-28-17

SIGNATURE OF THE INSURED (S)/OR DULY AUTHORIZED AGENT OF INSURED(S)

Q# 1708544 PRN:032317 CFG:OverrideTK L:101 DP%:38.612 RT:AFSIBEXTKDD:0 BM:Invoice  Old For:A16330-DOWN

The undersigned warrants and agrees:    **PRODUCER REPRESENTATIONS:**
(1) Insured has received a copy of this agreement, (2) the policies are in full force and effect and the information in the schedule of policies and the premiums are correct, (3) Insured has authorized this transaction, recognizes the security interest assigned herein, (4) to hold in trust for LENDER any payments made or credited to Insured through or to the undersigned, directly, indirectly, actually or constructively by any of the insurance companies and to pay the monies to LENDER upon demand to satisfy the then outstanding indebtedness of Insured and that any lien the undersigned now has or hereafter may require on any return premium arising out of the above listed insurance policies is subordinated to LENDER lien or security interest herein, (5) there are no exceptions to the policies financed other than those indicated and the policies comply with LENDER's eligibility requirements, (6) the policies can be cancelled by Insured or the company and the unearned premiums will be computed on the standard short rate or pro rata table except as indicated. (7) that if Insured is subject of bankruptcy or insolvency proceedings, must be disclosed to the LENDER. (8) The originator of this finance agreement may receive compensation from the lender for aiding in the preparation of this agreement and any portion of which is included in the finance charge above.

Date    3-28-17

RECEIVED
MAR 28 2017
AFS/IBEX

SIGNATURE OF DULY AUTHORIZED AGENT OR BROKER OF INSURED(S)

INPUT1 - AFSIBEX_PFA_METAV02(02/17)                Page 1 of 2

RED HOOK CONSTRUCTION GROUP-II, LLC
Quote# 1708544

## ADDITIONAL PROVISIONS OF SECURITY AGREEMENT

5. **DEFAULT:** Each of the following shall constitute an event of default under this Agreement:
   (a) Insured does not pay any installment according to the terms of this Agreement.
   (b) LENDER, in good faith, believes that the policy has been cancelled, modified, is no longer in effect, or was never in existence.
   (c) Insured does not comply with any of the terms of this Agreement.
   (d) Insured or Insurer voluntarily or involuntarily becomes the subject of a bankruptcy, receivership or any other kind of insolvency proceeding.
   (e) If Insured is a business and stops doing business or ceases to be qualified to do business. LENDER at its option may enforce payment of this debt without recourse to the security given to LENDER.
   (f) Any warranty, representation or statement made or furnished to LENDER by Borrower or on Borrower's behalf under this Agreement is false or misleading in any material respect, either now or at the time made or furnished, or becomes false or misleading at any time thereafter.

6. **CANCELLATION AND LENDER'S RIGHTS IN EVENT OF DEFAULT:** In the event of default, LENDER may cancel the insurance policies and the unpaid balance due to LENDER shall be immediately due by Borrower. Borrower hereby waives presentment, protest, and notice of dishonor. No delay or omission on LENDER's part to exercise any right or power arising hereunder will impair any such right or power or be considered a waiver of such right or power, nor will Lender's action or inaction impair any such right or power. Any payments made to LENDER after LENDER's Notice of Cancellation of the insurance policies has been mailed may be credited to the Borrower's account without affecting the acceleration of this Agreement and without any liability or obligation on LENDER's part to request reinstatement of the cancelled insurance policies. If there is a balance due after LENDER receives the unearned premiums, dividends, or loss payments from the insurance company then Borrower will pay the balance to LENDER with interest at the rate shown in this contract. If LENDER requests reinstatement, Borrower agrees that LENDER has no liability to Borrower if the policy is not reinstated. Only the insurance company has the authority to reinstate a policy financed pursuant to this Agreement.

7. **PREPAYMENT/REFUNDS:** Borrower shall have the right to prepay, in whole or in part, the amounts due hereunder at any time without penalty. If Borrower pays the total amount in Block "F" on page 1 early, Borrower shall receive a refund of the unearned finance charge computed in accordance with the Rule of 78s. If such prepayment in full occurs before the 1st installment due date, lender shall retain the finance charge which could be retained if the 1st installment period were 1 month and the loan were prepaid in full on the 1st installment due date. Any finance charge in excess of such amounts shall be refunded to Borrower. If a refund is less than $1.00, no refund shall be made.

8. **DOCUMENT STAMP TAX:** Fees assessed for state and government recording services as determined by applicable law.

9. **RETURNED CHECK CHARGE:** If any payment made by check is returned because Insured had no account or insufficient funds in the payor bank, Insured will be charged $15 if permitted by applicable law.

10. **LIMITED POWER OF ATTORNEY:** Borrower irrevocably appoints LENDER as its Attorney-In-Fact with full authority to cancel the insurance policies, and receive all sums assigned to LENDER or in which it has granted LENDER a security interest. LENDER may execute and deliver on Borrower's behalf all documents, instruments of payment, forms, and notices of any kind relating to the insurance policies in furtherance of this Agreement.

11. **ATTORNEYS' FEES AND EXPENSES:** LENDER may hire or pay someone else to help collect under this Agreement if Borrower does not pay. Borrower will pay LENDER all costs actually incurred, subject to any limits under applicable law, including reasonable attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower will also pay any court costs.

12. **SPECIAL INSURANCE POLICIES:** If the insurance policy Insured is audited by Insured is auditable or is a reporting form policy or subject to retrospective rating, Borrower agrees to promptly pay the insurance company the difference between the actual earned premium generated for the policy and the premiums financed under this Agreement.

13. **ADDITIONAL PREMIUMS:** Only those premiums shown will be advanced on behalf of Borrower. Payment of any additional premiums is the responsibility of Borrower. Should the Borrower desire to finance any additional premiums, written request must be provided to LENDER.

14. **SUCCESSORS AND ASSIGNS:** All legal rights given to LENDER shall benefit LENDER's successors and assigns. Insured agrees not to assign the policy without LENDER's written consent except for the interest of mortgagees and loss payees.

15. **BORROWER WARRANTIES AND REPRESENTATIONS:**
   (a) Borrower warrants to LENDER that the insurance policies listed in the above schedule have been issued to Insured and are in full force and effect and that the Borrower has not assigned any interest in the policies except for the interest of mortgagees and loss payees.
   (b) Borrower represents that it is not insolvent or presently the subject of any insolvency proceeding, nor are any such proceedings contemplated, or if the named Borrower is the subject of such proceeding, Borrower has notified LENDER in writing.
   (c) The execution and delivery of this Agreement will not violate any law or agreement governing Borrower or to which Borrower is a party, and its certificate or articles of incorporation and bylaws do not prohibit any term or condition of this Agreement.
   (d) Borrower will promptly notify LENDER in writing at LENDER's address on the first page of this Agreement (or such other addresses as LENDER may designate from time to time) prior to any change in Borrower's name, address, or any other change that directly or indirectly relates to this Agreement.

16. **RIGHT OF SETOFF:** To the extent permitted by applicable law, LENDER reserves a right of setoff in all Borrower's accounts with LENDER. This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. This does not include any accounts for which setoff would be prohibited by applicable law. Borrower authorizes LENDER, to the extent permitted by applicable law, to charge or setoff all sums owed to LENDER against any and all such accounts, and, at LENDER's option, to administratively freeze all such accounts to protect LENDER's charge and setoff rights provided in this paragraph.

17. **JURY WAIVER:** LENDER and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either LENDER or Borrower against the other.

18. **GOVERNING LAW AND VENUE:** This Agreement will be governed by federal law applicable to LENDER and, to the extent not preempted by federal law, the laws of the State of South Dakota without regard to its conflict of law provisions. If there is a lawsuit, Borrower agrees upon LENDER'S request to submit to the jurisdiction of the courts of Lincoln County, State of South Dakota.

19. **GENERAL PROVISIONS:** Entry into this financing arrangement is not a condition of obtaining insurance. You may opt to pay the premium for such insurance without financing such premium, or to obtain financing from some other source if you choose. If any provision contained in this Agreement should be invalid, illegal, or unenforceable in any respect, it shall not affect or impair the validity, legality, and enforceability of the remaining provisions of this Agreement. Failure to exercise any of its rights or remedies under this Agreement shall not result in any waiver by LENDER of those rights. All representations, warranties, and agreements made by Borrower in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's indebtedness is paid in full.

<u>USA PATRIOT Act/Customer Identification Program Disclosure Notice:</u>
To help the government fight the funding of terrorism and money laundering activities, U.S. Federal law requires financial institutions to obtain, verify, and record information that identifies each person (individual(s) or business(es)) that is granted a loan. What this means for you: As part of this premium finance agreement, you will be asked for your name, address, federal employer identification number and other information that allows us to identify you. You may also be asked to provide other identifying documents.

PRIOR TO SIGNING THIS AGREEMENT, BORROWER HAS READ AND UNDERSTANDS ALL THE PROVISIONS OF THIS AGREEMENT. BORROWER AGREES TO THE TERMS OF THIS AGREEMENT. BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS AGREEMENT.

RECEIVED
MAR 28 2017
AFS/IBEX

INPUT1 - AFSIBEX_PFA_METAV02(02/17)   Page 2 of 2

# EXHIBIT B

# AFS◉IBEX
### A division of MetaBank®

**PREMIUM FINANCE AGREEMENT**

☑ COMMERCIAL
☐ ADDITIONAL PREMIUM

Acct # _PSPS 7171_

| AFS/IBEX A division of MetaBank® | AGENT'S NAME AND ADDRESS    CODE:  A16330 | BORROWER'S NAME AND ADDRESS |
|---|---|---|
| PO Box 224528 Dallas, TX 75222-4528 Tel: (800) 299-5626 Fax (214) 954-0537 | Transportation Writers Inc 20 Broadhollow Rd Ste 1001A Melville, NY 11747 (631) 425-5111 | RED HOOK CONSTRUCTION GROUP-II, LLC 83 E Main St Bay Shore, NY 11706 (631) 841-4501 |

| A. Total Premiums | B. Down Payment | C. Document Stamp Tax | D. Amount Financed (A minus B plus C) | E. Finance Charge | F. TOTAL OF PAYMENTS (D PLUS E) | ANNUAL PERCENTAGE RATE |
|---|---|---|---|---|---|---|
| $ 3,320,960.00 | $ 332,096.00 | $ 0.00 | $ 2,988,864.00 | $ 68,783.30 | $ 3,057,647.30 | 4.990 % |

| Payment Schedule | NUMBER OF PAYMENTS | AMOUNT OF EACH PAYMENT | FIRST PAYMENT DUE |
|---|---|---|---|
| | 10 | $ 305,764.73 | 11/3/2016 (Monthly) |

Quote Number:1513761
Date Generated: 10/27/2016 2:07:53 PM

### SCHEDULE OF POLICIES

| POLICY PREFIX AND NUMBER | EFFECTIVE DATE OF POLICY | NAME OF THE INSURANCE COMPANY AND NAME/ADDRESS OF GENERAL OR POLICY ISSUING AGENT | TYPE OF COVERAGE | POLICY TERM | PREMIUM |
|---|---|---|---|---|---|
| TBI | 10/3/2016 | C05344-Scottsdale Insurance Company G05574-CRC Insurance Svs-NY Jericho [ME:25.000 %, CX:10]    [PR] | UMB Emd. Taxes/Fees Fin. Taxes/Fees | 12 | 1,200,000.00 0.00 45,360.00 |
| TBI | 10/3/2016 | C05238-*Lloyds Of London G05574-CRC Insurance Svs-NY Jericho [ME:25.000 %, CX:10]    [AU, PR] | GL Emd. Taxes/Fees Fin. Taxes/Fees | 12 | 2,000,000.00 0.00 75,600.00 |

| 100% OF ALL FEES AND TAXES MUST BE INCLUDED | TOTAL PREMIUMS must agree with Block "A" above | TOTAL | $ 3,320,960.00 |
|---|---|---|---|

1,120,824.00,1,888,040.00

## Security Agreement

1. **DEFINITIONS:** The above insured "Borrower" or "Insured" is the debtor. AFS/IBEX A division of MetaBank®, is the lender to whom the debt is owed (LENDER). Singular words shall mean plural and vice versa as may be required in order to give the agreement meaning "insurance company or company", "insurance policy or policy", and "premium" refer to those items listed under "Schedule of Policies".

2. **PROMISE TO PAY:** Borrower promises to pay LENDER the total amount in Block "F" above until paid in full. This total equals the principal amount of the amount financed together with interest at the rate identified above computed in accordance with the Rule of 78's. The monthly payment amount reflected above will be due on the same day each month. Payments include principal and interest. Insured will pay LENDER at its address above, or such other place LENDER may designate in writing.

3. **SECURITY INTEREST:** Borrower hereby grants LENDER a security interest in all insurance policies listed herein and all unearned premium, returned premium, dividend payments, and loss payments which reduce the unearned premiums thereof ("Collateral"). Borrower assigns to LENDER as security for the total amount payable in this Agreement any of the above which may become payable under the insurance policies, subject to any mortgagee or loss payee interests. Borrower agrees to take whatever actions are requested by LENDER to perfect and continue LENDER's security interest in the Collateral.

4. **LATE CHARGE:** Upon default of payment of any installments for not less than five days (or such greater number of days required by applicable law), Borrower agrees to pay a late charge up to 5% of such installment.

The undersigned warrants and agrees:
NOTICE TO INSURED: (1) DO NOT SIGN this agreement until you have read all pages and filled in any blank spaces. (2) When signed below by you, or on your behalf, you (Borrower acknowledge receipt of a copy this Agreement, attest to having full power and authority to enter into this Agreement and sign on behalf of all entities named above as Borrower, and that you understand and agree to the provisions printed above and in the ADDITIONAL PROVISIONS section of this Agreement and that both the front and any subsequent pages constitute the Agreement between Borrower and Lender. (3) You understand that this is for commercial policies and the producer may be receiving a compensation from the LENDER for the preparation and administration of this Agreement as further described below.

Borrower hereby requests LENDER to pay the financed portion of its insurance policy premiums listed above, on its behalf and AGREES TO THE PROVISIONS OF THIS AGREEMENT, INCLUDING THE PROVISIONS ABOVE AND THOSE THAT FOLLOW.

Date ⊗ _10/12/16_                                     ⊗ _[signature]_
                                                      SIGNATURE OF THE INSURED(S) OR DULY AUTHORIZED AGENT OF INSURED(S)

Cd 1513761 PRN:100716 CFC:Overdraft1 L:101 DP%:10.000 RT:AFS&EXMT ARFP:TW DD:0 BM:Invoice. Old For:AT6350
DOWN MEMOS

The undersigned warrants and agrees:
PRODUCER REPRESENTATIONS:
(1) Insured has received a copy of this agreement, (2) the policies are in full force and effect and the information in the schedule of policies and the premiums are correct, (3) Insured has authorized this transaction, recognizes the security interest assigned herein, (4) to hold in trust for LENDER any payments made or credited to Insured through or to the undersigned, directly, indirectly, actually or constructively by any of the insurance companies and to pay the monies to LENDER upon demand to satisfy the then outstanding indebtedness of Insured and that any lien the undersigned now has or hereafter may require on any return premium arising out of the above listed insurance policies is subordinated to LENDER lien or security interest herein, (5) there are no exceptions to the policies financed other than those indicated and the policies comply with LENDER's eligibility requirements, (6) the policies can be cancelled by Insured or the company and the unearned premiums will be computed on the standard short rate or pro rata table except as indicated, (7) that if Insured is subject of bankruptcy or insolvency proceeding, it must be disclosed to the LENDER. (8) The originator of this finance agreement may receive compensation from the lender for aiding in the preparation of this agreement and payment of the finance premiums which is included in the finance charge above.

Date _10/7/16_                                     _[signature]_                RECEIVED
                                                   SIGNATURE OF DULY AUTHORIZED AGENT OR BROKER OF INSURED(S)    OCT 11 2016
                                                                                                                 AFS/IBEX

## ADDITIONAL PROVISIONS OF SECURITY AGREEMENT

5.   DEFAULT: Each of the following shall constitute an event of default under this Agreement:
   (a)   Insured does not pay any installment according to the terms of this Agreement.
   (b)   LENDER, in good faith, believes that the policy has been cancelled, modified, is no longer in effect, or was never in existence.
   (c)   Insured does not comply with any of the terms of this Agreement.
   (d)   Insured or insurer voluntarily or involuntarily becomes the subject of a bankruptcy, receivership or any other kind of insolvency proceeding.
   (e)   If Insured is a business and stops doing business or ceases to be qualified to do business, LENDER at its option may enforce payment of this debt without recourse to the security given to LENDER.
   (f)   Any warranty, representation or statement made or furnished to LENDER by Borrower or on Borrower's behalf under this Agreement is false or misleading in any material respect, either now or at the time made or furnished, or becomes false or misleading at any time thereafter.

6.   CANCELLATION AND LENDER'S RIGHTS IN EVENT OF DEFAULT: In the event of default, LENDER may cancel the insurance policies and the unpaid balance due to LENDER shall be immediately due by Borrower. Borrower hereby waives presentment, protest, and notice of dishonor. No delay or omission on LENDER's part to exercise any right or power arising hereunder will impair any such right or power or be considered a waiver of such right or power, nor will Lender's action or inaction impair any such right or power. Any payments made to LENDER after LENDER's Notice of Cancellation of the insurance policies has been mailed may be credited to the Borrower's account without affecting the acceleration of this Agreement and without any liability or obligation on LENDER's part to request reinstatement of the cancelled insurance policies. If there is a balance due after LENDER receives the unearned premiums, dividends, or loss payments from the insurance company then Borrower will pay the balance to LENDER with interest at the rate shown in this contract. If LENDER requests reinstatement, Borrower agrees that LENDER has no liability to Borrower if the policy is not reinstated. Only the insurance company has the authority to reinstate a policy financed pursuant to this Agreement.

7.   PREPAYMENT/REFUNDS: Borrower shall have the right to prepay, in whole or in part, the amounts due hereunder at any time without penalty. If Borrower pays the total amount in Block "F" on page 1 early, Borrower shall receive a refund of the unearned finance charge computed in accordance with the Rule of 78s. If such prepayment in full occurs before the 1st installment due date, lender shall retain the finance charge which could be retained if the 1st installment period were 1 month and the loan were prepaid in full on the 1st installment due date. Any finance charge in excess of such amounts shall be refunded to Borrower. If a refund is less than $1.00, no refund shall be made.

8.   DOCUMENT STAMP TAX: Fees assessed for state and government recording services as determined by applicable law.

9.   RETURNED CHECK CHARGE: If any payment made by check is returned because insured had no account or insufficient funds in the payor bank, insured will be charged $15 if permitted by applicable law.

10.   LATE CHARGE: If a payment is more than 10 days late, insured agrees to pay a late charge up to 5% of each delinquent or unpaid installment if permitted by applicable law.

11.   LIMITED POWER OF ATTORNEY: Borrower irrevocably appoints LENDER as its Attorney-In-Fact with full authority to cancel the insurance policies, and receive all sums assigned to LENDER or in which it has granted LENDER a security interest. LENDER may execute and deliver on Borrower's behalf all documents, instruments of payment, forms, and notices of any kind relating to the insurance policies in furtherance of this Agreement.

12.   ATTORNEYS' FEES AND EXPENSES: LENDER may hire or pay someone else to help collect under this Agreement if Borrower does not pay. Borrower will pay LENDER all costs actually incurred, subject to any limits under applicable law, including reasonable attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower will also pay any court costs.

13.   SPECIAL INSURANCE POLICIES: If the insurance policy issued to Insured is auditable or is a reporting form policy or subject to retrospective rating, Borrower agrees to promptly pay the insurance company the difference between the actual earned premium generated for the policy and the premiums financed under this Agreement.

14.   ADDITIONAL PREMIUMS: Only those premiums shown will be advanced on behalf of Borrower. Payment of any additional premiums is the responsibility of Borrower. Should the Borrower desire to finance any additional premiums, written request must be provided to LENDER.

15.   SUCCESSORS AND ASSIGNS: All legal rights given to LENDER shall benefit LENDER's successors and assigns. Insured agrees not to assign the policy without LENDER's written consent except for the interest of mortgagees and loss payees.

16.   BORROWER WARRANTIES AND REPRESENTATIONS:
   (a)   Borrower warrants to LENDER that the insurance policies listed in the above schedule have been issued to Insured and are in full force and effect and that the Borrower has not assigned any interest in the policies except for the interest of mortgagees and loss payees.
   (b)   Borrower represents that it is not insolvent or presently the subject of any insolvency proceeding, nor are any such proceedings contemplated, or if the named Borrower is the subject of such proceeding, Borrower has notified LENDER in writing.
   (c)   The execution and delivery of this Agreement will not violate any law or agreement governing Borrower or to which Borrower is a party, and its certificate or articles of incorporation and bylaws do not prohibit any term or condition of this Agreement.
   (d)   Borrower will promptly notify LENDER in writing at LENDER's address on the first page of this Agreement (or such other addresses as LENDER may designate from time to time) prior to any change in Borrower's name, address, or any other change that directly or indirectly relates to this Agreement.

17.   RIGHT OF SETOFF: To the extent permitted by applicable law, LENDER reserves a right of setoff in all Borrower's accounts with LENDER. This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. This does not include any accounts for which setoff would be prohibited by applicable law. Borrower authorizes LENDER, to the extent permitted by applicable law, to charge or setoff all sums owed to LENDER against any and all such accounts, and, at LENDER's option, to administratively freeze all such accounts to protect LENDER's charge and setoff rights provided in this paragraph.

18.   JURY WAIVER: LENDER and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either LENDER or Borrower against the other.

19.   GOVERNING LAW AND VENUE: This Agreement will be governed by federal law applicable to LENDER and, to the extent not preempted by federal law, the laws of the State of South Dakota without regard to its conflict of law provisions. If there is a lawsuit, Borrower agrees upon LENDER's request to submit to the jurisdiction of the courts of Lincoln County, State of South Dakota.

20.   GENERAL PROVISIONS: Entry into this financing arrangement is not a condition of obtaining insurance. You may opt to pay the premium for such insurance without financing such premium, or to obtain financing from some other source if you choose. If any provision contained in this Agreement should be invalid, illegal, or unenforceable in any respect, it shall not affect or impair the validity, legality, and enforceability of the remaining provisions of this Agreement. Failure to exercise any of its rights or remedies under this Agreement shall not result in any waiver by LENDER of those rights. All representations, warranties, and agreements made by Borrower in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's indebtedness is paid in full.

**USA PATRIOT Act/Customer Identification Program Disclosure Notice:**
To help the government fight the funding of terrorism and money laundering activities, U.S. Federal law requires financial institutions to obtain, verify, and record information that identifies each person (individual(s) or business(es)) that is granted a loan. What this means for you: As part of this premium finance agreement, you will be asked for your name, address, federal employer identification number and other information that allows us to identify you. You may also be asked to provide other identifying documents.

PRIOR TO SIGNING THIS AGREEMENT, BORROWER HAS READ AND UNDERSTANDS ALL THE PROVISIONS OF THIS AGREEMENT. BORROWER AGREES TO THE TERMS OF THIS AGREEMENT. BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS AGREEMENT.

RECEIVED

OCT 14 2016

AFS/IBEX